# United States Court of Appeals

## For the First Circuit

No. 03-2146

AZZEDINE LATTAB,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF A FINAL ORDER

OF UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT

Before

Selya, Dyk* and Howard,

Circuit Judges.

Carlos E. Estrada, with whom Allan M. Tow was on brief, for petitioner.
Trina A. Realmuto and Nadine K. Wettstein on brief for American Immigration Law Foundation, amicus curiae.
Papu Sandhu, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, and Emily Anne Radford, Assistant Director, were on brief, for respondent.

September 14, 2004

_____

*Of the Federal Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  The petitioner, Azzedine Lattab, is an Algerian national.  His case presents a gallimaufry of issues, including yet another in the series of retroactivity problems that have trailed Congress's enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-598 (IIRIRA).  Broadly stated, Lattab — with the able assistance of the amicus — attacks an IIRIRA provision, codified at 8 U.S.C. § 1231(a)(5), which mandates the reinstatement of a prior deportation order (or removal order — the terms are interchangeable on these facts) when an alien subject to such an order is found to have reentered the country illegally.  He argues that the reinstatement provision is impermissibly retroactive as applied to his case; that the regulatory procedure implementing it is ultra vires; and that, in all events, the provision deprives illegally reentering aliens of procedural due process.  As a fallback, he asserts that the reinstatement provision ought not to have been invoked in this instance because another statute trumped its operation.  Concluding, as we do, that this asseverational array lacks force, we deny and dismiss the petition for review.

## I.  THE NEW REINSTATEMENT PROVISION

We begin by limning the parameters of the new reinstatement provision.  Among many other innovations, IIRIRA repealed the former reinstatement provision, section 242(f) of the

Immigration and Nationality Act (INA), 8 U.S.C. § 1252(f) (repealed 1996), and enacted a new reinstatement provision at section 241(a)(5), 8 U.S.C. § 1231(a)(5).[1]  Section 241(a)(5) provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under [the INA], and the alien shall be removed under the prior order at any time after the reentry.

This provision took effect on April 1, 1997.  It altered preexisting law in at least three salient respects.  First, under the old regime only illegal reentrants who had previously been deported on certain specified grounds (e.g., conviction for an aggravated felony) were subject to having their original deportation orders reinstated.  Under section 241(a)(5), however, all illegal reentrants now face the prospect of such reinstatement.  See Arevalo v. Ashcroft, 344 F.3d 1, 5 (1st Cir. 2003).  Second, under the earlier system an alien had a right to a hearing, presided over by an immigration judge, before reinstatement of the prior deportation order became a fait accompli.  Under the

_____

[1]For better or worse, it is customary when discussing immigration law to refer to sections of the INA and the various statutes amending it by public law section number rather than United States Code section number.  We will adhere to this convention and provide parallel citations to the relevant code provisions only when referring to statutory sections for the first time.

regulations implementing section 241(a)(5), however, there is no longer a right to such a hearing (or to any hearing, for that matter). See 8 C.F.R. § 241.8. Third, preexisting law allowed an illegal reentrant to attempt to fend off execution of a reinstated deportation order by petitioning for discretionary relief in the form of an adjustment of his status to that of an alien lawfully admitted for permanent residence. Conversely, section 241(a)(5) pretermits an illegal reentrant's ability to apply for any relief under the INA. See Arevalo, 344 F.3d at 5.

## II. THE FACTUAL BACKGROUND

We next recount the facts undergirding the case. The petitioner first entered the United States on February 7, 1992, as a tourist. He overstayed his visa and remained here for some time. On March 29, 1996, an immigration judge found him deportable but allowed him to depart voluntarily on or before June 27 of that year. The petitioner failed to comply — he did not leave the United States until August 23, 1996 — and that default caused the immigration judge's ukase to mutate into a deportation order. See 8 C.F.R. § 243.5 (repealed 1997). In the eyes of the law, therefore, the petitioner's belated departure was tantamount to self-deportation. Id.

While in the United States, the petitioner had become romantically involved with a United States citizen (he claims that they had become engaged). He reentered the United States illegally

-4-

on March 1, 1997, and resumed this courtship.  He and his fiancee were married on July 5, 1999.

On May 23, 2000, the petitioner's wife filed an "immediate relative" petition with the Immigration and Naturalization Service (INS).[2]  This petition was approved on August 28, 2002.  That approval, standing alone, did not affect the petitioner's immigration status, but, rather, paved the way for a possible adjustment.  See INA § 245(i), 8 U.S.C. § 1255(i).  To that end, he immediately sought to have his status changed to that of lawful permanent resident.  During the pendency of that application, the INS approved the petitioner's request for temporary authorization to engage in employment.  See 8 C.F.R. § 274a.12(c).

On August 5, 2003, the petitioner endeavored to renew his employment authorization.  While at the CIS office in Boston, an immigration officer discovered that the petitioner had been deported once before.  He was taken into custody and soon thereafter ICE, relying on section 241(a)(5), reinstated the 1996 deportation order.

---

[2]The Homeland Security Act of 2002, Pub. L. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)), abolished the INS and transferred its duties to the Department of Homeland Security.  The INS functions related to the processing of applications for adjustment of status now reside in the United States Citizenship and Immigration Service (CIS).  Responsibility for immigration enforcement, including the authority to reinstate prior orders of deportation, lies with a separate sub-agency known as United States Immigration and Customs Enforcement (ICE).

Dismayed by this chain of events, the petitioner sought judicial review. His petition contends, inter alia, that the government's attempt to apply section 241(a)(5) to his case has an impermissibly retroactive effect; that the summary reinstatement of the prior deportation order disregarded both statutorily mandated procedures and the dictates of the Due Process Clause; and that in the circumstances of this case, section 241(a)(5) must yield to a different (allegedly conflicting) INA provision. Because an order reinstating a prior removal order is "the functional equivalent of a final order of removal," Arevalo, 344 F.3d at 9, we have jurisdiction to hear and determine these contentions under 8 U.S.C. § 1252.

## III. ANALYSIS

The petitioner and the amicus advance four principal arguments. We consider them in an order that roughly corresponds to the amount of energy that they have devoted to each.

### A. Retroactivity.

The centerpiece of the petitioner's case is a claim that application of section 241(a)(5) to his circumstances is impermissibly retroactive. Since IIRIRA took effect after his illegal reentry in 1997, this thesis runs, retroactive application of the new reinstatement proviso would violate his settled expectation that he would be allowed to seek an adjustment of his immigration status following his marriage.

-6-

Whether application of a statute to a given situation is impermissibly retroactive presents a quintessentially legal question. Judicial review is de novo and, accordingly, the agency's views garner no special deference. Arevalo, 344 F.3d at 9-10 (explaining that "courts, rather than agencies, are best equipped to make the constitutionally tinged judgment calls inherent in retroactivity determinations"). We proceed on that basis.

There is no doubt that Congress has the raw power to enact statutes that operate retroactively. See Landgraf v. USI Film Prods., 511 U.S. 244, 267 (1994). But because retroactive legislation has the potential to alter the consequences of actions already taken, courts start with a presumption that Congress intends to legislate prospectively. Id. at 272-73. Congress can overcome this presumption and give legislation a retroactive effect only by clearly indicating its intent to do so. Id. at 268.

We analyze the possibility that Congress intended a statute to apply retroactively under the rubric set forth in Landgraf. Initially, we decide whether Congress has clearly stated an intention to have the statute apply retrospectively. Id. at 280; Arevalo, 344 F.3d at 10. Although this prong of the test requires Congress's intention to be unmistakable, our inquiry is not limited to the statutory text but may include an examination of standard ensigns of statutory construction, such as the statute's

structure and legislative history.  See Martin v. Hadix, 527 U.S. 343, 355-57 (1999); see also Arevalo, 344 F.3d at 11-13 (examining these factors in determining the sweep of section 241(a)(5), but noting that "the benchmark for finding unambiguous temporal scope is quite high").  If this perscrutation leads to a firm conviction that Congress intended the statute to have a specific temporal reach, the retroactivity analysis ends and we will apply the statute in accordance with Congress's prescription.  In the absence of such a directive, we will proceed to determine whether the application in question would have an impermissibly retroactive effect.  Landgraf, 511 U.S. at 280; Arevalo, 344 F.3d at 10-11. That result obtains if the specified application would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Landgraf, 511 U.S. at 280.  In that event, the presumption that Congress did not intend the statute to apply retrospectively will hold.  Arevalo, 344 F.3d at 11.  Otherwise, retroactive application is permissible.  Id.

In the case at hand, the search for express congressional intent need not occupy us for long.  Three years ago, the Supreme Court ruled that Congress did not specify the temporal reach of section 304 of IIRIRA.  INS v. St. Cyr, 533 U.S. 289, 320 (2001). Building on that foundation, we concluded last year that section 241(a)(5) shared this characteristic.  Arevalo, 344 F.3d at 13.  In

forming that conclusion, we carefully examined both the text and legislative history of IIRIRA in general and section 241(a)(5) in particular. Id. at 11-13. This exercise left us with the conviction that "section 241(a)(5) is hopelessly unclear as to whether it applies to those who illegally reentered the United States before April 1, 1997." Id. at 13. This panel is bound by that determination. United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991).

The second step of the Landgraf pavane requires us to determine whether application of section 241(a)(5) to the petitioner's circumstances would have an impermissibly retroactive effect. The logical starting point for this inquiry is the ascertainment of what rights and justifiable expectations the petitioner may have had under the law as it existed immediately before IIRIRA's effective date.

The law did not change between the date when the petitioner illegally reentered the country (March 1, 1997) and IIRIRA's effective date (April 1, 1997). Under that regime, the petitioner was immediately deportable. See 8 U.S.C. § 1227 (1994) (specifying grounds for deportation). There is no indication in the record that the petitioner ever sought, or qualified for, asylum. From aught that appears, in the spring of 1997 he would not have had any defense to deportation.

To be sure, at that time the petitioner would not have been subject to summary reinstatement of the prior deportation order. Instead, deportability would have been determined in a new proceeding before an immigration judge. See 8 C.F.R. § 242.23 (repealed 1999). Pre-IIRIRA law would have allowed the petitioner, coincident with the commencement of that new proceeding, to apply for adjustment of his immigration status based upon his marriage, notwithstanding the fact that he had reentered the country illegally. INA § 245, 8 U.S.C. § 1255(i).

Given that template, IIRIRA worked relatively few changes in the petitioner's situation. Substantively, he was still illegally in the country and still subject to deportation after the new law took effect. While section 241(a)(5) barred him from applying for any affirmative relief (such as an adjustment of status) from and after April 1, 1997, that change was inconsequential because there was no relief for which petitioner could then have qualified. After all, his wedding did not occur until July 5, 1999 (over two years after IIRIRA took effect).

In fact, the only consequence that IIRIRA added to the petitioner's illegal reentry was procedural: he was subject to having his prior deportation order peremptorily reinstated and was no longer entitled to a hearing before that reinstatement. That consequence is insufficient to derail the application of the new statute. As a general rule, the application of new procedural

mechanisms to the adjudication of past conduct is not impermissibly retroactive.  <u>Landgraf</u>, 511 U.S. at 275.  More to the point, we previously have held that this precise procedural change falls within that general rule, not within the long-odds exception to it.  See <u>Arevalo</u>, 344 F.3d at 13 (holding that "although aliens subject to reinstatement of a previous deportation order had a right to . . . a hearing before the passage of the IIRIRA, . . . that right was procedural and, therefore, can be taken away retroactively").  Other courts agree.  <u>See</u>, <u>e.g.</u>, <u>Ojeda-Terrazas</u> v. <u>Ashcroft</u>, 290 F.3d 292, 301-02 (5th Cir. 2002); <u>Alvarez-Portillo</u> v. <u>Ashcroft</u>, 280 F.3d 858, 865 (8th Cir. 2002).

The petitioner nonetheless maintains that section 241(a)(5) ought not be applied to bar his application for adjustment of status because at the time section 241(a)(5) took effect, he planned to marry a United States citizen and thus become eligible for lawful permanent resident status.  He points to the government's longstanding practice of allowing an alien illegally present in the United States to seek adjustment of status following marriage to a citizen and asserts that he was entitled to rely on this praxis.  This assertion comprises more cry than wool.

A statute only has an impermissibly retroactive effect when it would change the legal consequences of actions actually taken (or refrained from) prior to the statute's effective date.  <u>See</u> <u>Landgraf</u>, 511 U.S. at 280.  Inchoate plans to act in the

future, even when made in anticipation of the legal consequences of those future actions, do not convey the type of settled expectation that retroactivity analysis seeks to protect. See id. at 269 (noting that retroactive application of a statute is not impermissible merely because that application "upsets expectations based in prior law"). Because the petitioner did not marry (and thus, did not qualify for adjustment of status) until more than two years after IIRIRA's effective date, he cannot validly complain about the elimination of his ability to apply for a future adjustment of status. The decisive datum is that the petitioner had no sufficiently settled expectation that he could adjust his status at the time section 241(a)(5) took effect, because he was not yet married. Thus, applying that provision to the petitioner is not impermissibly retroactive.

There are two loose ends. First, the petitioner asserts that because he applied for adjustment of status before the government actually reinstated the prior order of deportation, section 241(a)(5)'s bar to relief ought not to apply. We deem this argument squarely foreclosed by the text of the statute. Section 241(a)(5) subjects an illegal reentrant to three independent consequences: reinstatement of the prior deportation order, ineligibility for any relief, and removal. Grammatically, section 241(a)(5) does not make ineligibility for relief dependent upon reinstatement of the prior deportation order. And even if it did,

section 241(a)(5) expressly makes reinstatement retroactive to the date of the original deportation order.[3]

The second loose end is a bit different. In a post-argument letter, see Fed. R. App. P. 28(j); 1st Cir. R. 28(j), the petitioner attempted to embrace the recent decision in Perez-Gonzalez v. Ashcroft, ___ F.3d ___ (9th Cir. 2004) [2004 WL 1801894]. That case involved the effect of a pending application for permission to reenter the country, filed after the petitioner illegally reentered, on the relief bar erected by section 241(a)(5). The Ninth Circuit stated that if the application were approved, that approval would cure the illegal reentry and section 241(a)(5) would not apply. Id. at ___ [2004 WL 1801894, at *11]. The petitioner now seeks to avail himself of this possible escape hatch.

In this case, unlike in Perez-Gonzalez, the petitioner did not argue that approval of an application for permission to reenter would cure his illegal reentry; nor did he argue, by analogy, that the government's approval of his wife's "immediate relative" petition should be accorded a similar effect. It is readily apparent, then, that Perez-Gonzalez turns on a legal theory never explored either in the petitioner's briefs to this court or

---

[3]The petitioner's sole support for this argument derives from the decision in Prado Hernandez v. Reno, 86 F. Supp. 2d 1037 (W.D. Wash. 1999). We find that decision unpersuasive and decline to follow it.

at oral argument.  The usual rule, applicable here, is that new theories cannot be raised in a post-argument Rule 28(j) filing. United States v. Nason, 9 F.3d 155, 163 (1st Cir. 1993).  It is arguable that this theory has been waived; at best, it has been forfeited.  See Bennett v. City of Holyoke, 362 F.3d 1, 9 (1st Cir. 2004).

Of course, a forfeited argument occasionally can be resurrected under the plain error doctrine.  See, e.g., United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  But that doctrine contains fairly rigorous criteria.  See, e.g., id.  It requires, at a bare minimum, that the complaining party point to a "clear or obvious" error.  Id.  Here, however, we have grave doubts about the correctness of the Perez-Gonzalez court's conclusion.  It seems to us that permission to reenter, like adjustment of status, is relief under the INA, which section 241(a)(5) precludes an illegal reentrant from seeking.  Furthermore, we find it difficult to accept the Ninth Circuit's heavy reliance on regulations that antedate IIRIRA in interpreting the reach of section 241(a)(5).  We are, therefore, unable to find a clear or obvious error in ICE's decisionmaking.

Although that ends this phase of our analysis, we add a coda.  We hold today only that application of section 241(a)(5) to deprive an alien who illegally reentered the country before IIRIRA's effective date of the ability to apply for relief for

which the alien did not theretofore qualify is not impermissibly retroactive. We do not purport to decide the retroactive application of section 241(a)(5) to all aliens who reentered illegally before April 1, 1997, nor do we address the case of an alien illegally present in the United States who had a potential defense to deportation before IIRIRA took effect but had not yet applied for relief when IIRIRA eliminated that defense. We leave these questions for future cases, pausing only to remind the reader that application of retroactivity principles requires "commonsense, functional judgment[s]," Hadix, 527 U.S. at 357, and that each case should be assessed on its own facts.

## B. Ultra Vires.

Having determined that the application of section 241(a)(5) to the petitioner's circumstances does not have an impermissibly retroactive effect, we next consider the petitioner's claim that 8 C.F.R. § 241.8, which implements section 241(a)(5), is at variance with the procedures stipulated in INA § 240, 8 U.S.C. § 1229a. This question engenders review under a familiar two-part paradigm. See generally INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Under that paradigm, we first determine whether Congress has spoken clearly on the precise question. Chevron, 467 U.S. at 842-43. If it has, we will enforce Congress's instructions. Id. at 842. If it has not, we will defer

to the administering agency's construction of the statute so long as that construction is reasonable. Id. at 843.

The challenged regulation provides for reinstatement of a prior deportation order without first affording an alien a hearing before an immigration judge. 8 C.F.R. § 241.8. The petitioner contrasts this spartan regime with INA § 240, which sets forth the procedures to be followed when determining removability in the first instance. In general, section 240 entitles aliens to be represented by counsel, to be heard by an immigration judge, to adduce evidence, and to cross-examine adverse witnesses. That section further provides:

> Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States . . . .

8 U.S.C. § 1229a(a)(3). The petitioner says that summary reinstatement of a deportation order sets up a parallel procedure for removal and thus conflicts with the quoted statute. In the petitioner's view, this renders the regulation ultra vires.

The government retorts that summary reinstatement of a deportation order is not beyond the Attorney General's statutory authority because INA § 241(a)(5) provides an explicit, congressionally sanctioned alternative to the otherwise exclusive procedure delineated in section 240. The government seeds its argument with persistent references to the legislative history.

-16-

Those references indicate (or so the government says) that Congress intended aliens who reentered the country illegally after once having been deported to be treated as a separate class and removed expeditiously. See, e.g., H.R. Rep. No. 104-469, pt. 1, at 13 (1996) (explaining that "if aliens who are ordered removed . . . seek reentry they are subject to immediate removal under the prior order").

The petitioner's argument has a veneer of plausibility. After all, the decision to reinstate a prior deportation order is to some extent a determination as to whether an alien may be removed from the United States. Cf. Arevalo, 344 F.3d at 9 (holding, albeit in the context of appellate jurisdiction, that "reinstatement itself operates as the functional equivalent of a final order of removal"). This carapace, however, is easily pierced. Considering section 240 in the context of the INA as a whole, we conclude that its application to the reinstatement of earlier deportation orders is at best uncertain.

For one thing, section 240 is primarily concerned with proceedings to determine whether aliens are excludable or deportable on one of the bases enumerated in INA §§ 212 and 237, 8 U.S.C. §§ 1182 and 1227. See 8 U.S.C. § 1229a(a)(2) ("An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under [section 212] or any ground of deportability under [section 237]."). In contrast,

section 241 deals specifically with aliens who already have been ordered removed, and the placement of the reinstatement provision in a separate section logically can be understood as indicating a congressional intention to treat reinstatement determinations differently from first-instance determinations of removability. Cf. Alexander v. Sandoval, 532 U.S. 275, 288-91 (2001) (relying in part on the separation of substantive standards and regulatory authority into different sections of a single statute to find that Congress intended to create a private right of action to enforce the former, but not the latter).

For another thing, when Congress enacted IIRIRA, it plainly was dissatisfied with the performance of the former reinstatement provision, which had "fallen into desuetude." Castro-Cortez v. INS, 239 F.3d 1037, 1040 n.1 (9th Cir. 2001). Congress apparently believed that the reinstatement regime should be altered dramatically, Alvarez-Portillo, 280 F.3d at 863, and reformed to function swiftly and simply. See, e.g., S. Rep. 104-249, at 7 (1995) ("Aliens who violate U.S. Immigration law should be removed from this country as soon as possible."); H.R. Rep. No. 104-469, supra, at 134 (calling pre-IIRIRA procedures "cumbersome and duplicative," and positing that IIRIRA would correct these flaws). We think it unarguable that Congress intended IIRIRA to strengthen the reinstatement provision and to make it operate more efficiently. Viewed against this backdrop, it seems reasonable

-18-

that, rather than spelling out procedural changes by statute, Congress may have expected the Attorney General to reevaluate the implementation of the reinstatement statute and to set in place a regulatory regimen that would further these goals.

That said, we find the government's statutory interpretation no more compelling. The text of section 241(a)(5) simply will not bear the weight that the Attorney General tries to pile upon it. To say, as does section 241(a)(5), that an alien "shall be removed under the prior order at any time after . . . reentry" says nothing about how the government may go about determining either the existence of a prior order or the fact of an illegal reentry. See Castro-Cortez, 239 F.3d at 1048. Nor does section 241(a)(5)'s bar on seeking relief from reinstatement of an earlier order necessarily indicate an intention that the prior order be reinstated peremptorily.

The INA, taken as a whole, highlights this lack of certitude. When compared with other provisions explicitly authorizing alternative procedures, section 241(a)(5) looks even less like an explicit authorization. For example, section 235 of the INA, 8 U.S.C. § 1225, provides for summary removal proceedings for certain aliens upon their arrival in the United States. To take one case, that section provides that aliens who arrive without proper documentation shall be removed "without further hearing or review." Id. § 1225(b)(1)(i). In a similar vein, stowaways are

-19-

expressly ineligible for "a hearing under [section 240]." Id. § 1225(a)(2). The absence of comparably explicit language in section 241(a)(5) reinforces our intuition that we should not read that section as evincing congressional intent to mandate summary procedures for reinstating prior deportation orders.

The legislative history marshaled by the government does not save the day. Although that history tends to cast doubt on the petitioner's assessment of the statutory scheme, see text supra, it is in the end inconclusive. Much like the statute itself, the legislative history indicates a general intent that illegal reentrants be removed expeditiously, but it does not address procedural questions with either clarity or specificity. The committee report quoted extensively by the government illustrates this point: although stating that "[e]xisting procedures to deny entry to and remove illegal aliens from the United States are cumbersome and duplicative," H.R. Rep. 104-469, supra, at 134, it neither explicates nor endorses any particular procedures for reinstating removal orders. Given this indeterminacy, we decline to read a procedural mandate into section 241(a)(5).

The bottom line is that we find the INA ambiguous with regard to the procedures to be used when the government, in the post-IIRIRA era, seeks to reinstate a prior removal order against an illegal reentrant. Because the statutory scheme lacks clarity in this respect, we answer the first Chevron question in the

negative and proceed to the second <u>Chevron</u> question. At that stage, we assay the government's implementation of the statute, as expressed in its rulemaking, mindful that we must defer to that rulemaking as long as we find it reasonable. <u>Aguirre-Aguirre</u>, 526 U.S. at 424; <u>Chevron</u>, 467 U.S. at 843. We have little difficulty in concluding that the government's interpretation satisfies this condition.

As said, the legislative history shows that Congress, in enacting IIRIRA, sought to make the removal of illegal reentrants more expeditious. Providing a mechanical procedure for the reinstatement of prior orders is entirely consistent with this purpose. Moreover, we agree with the Eighth Circuit that the elimination of any exogenous defense to reinstatement significantly narrows the range of issues to be adjudicated, thereby limiting the value of additional procedures. See <u>Alvarez-Portillo</u>, 280 F.3d at 868 ("The streamlined notice and opportunity to be heard afforded illegal reentrants under 8 C.F.R. § 241.8 seem quite appropriate when the only issues to be determined are those establishing the agency's right to proceed under § 241(a)(5) — the alien's identity, the existence of a prior removal order, and whether the alien has unlawfully reentered."). For these reasons, we conclude that it is reasonable to interpret the INA, as amended by IIRIRA, as giving

the government authority to craft a streamlined procedure for the reinstatement of earlier deportation orders.[4]

## C. **Due Process**.

The petitioner next essays a constitutional challenge. He posits that even if the summary reinstatement procedure is not ultra vires, it nonetheless fails to pass muster under the Due Process Clause of the Fifth Amendment.[5]

---

[4]We need not address the reasonableness of the particular summary reinstatement procedure adopted by the government. While the petitioner has challenged the constitutionality of those procedures, see infra Part III(C), he has not challenged their reasonableness. In all events, there was no conceivable error in the reinstatement of the petitioner's original deportation order. Consequently, we leave an assessment of the reasonableness of the specific procedures adopted by the government for another day.

[5]If a constitutional challenge of this sort were to hold water, that doubtless would affect our judgment on the second step of the Chevron pavane. An interpretation of a statute that is unconstitutional, is by definition unreasonable. U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999).

One member of the panel questions whether the statute (section 241(a)(5)) should be construed under the first step of Chevron to avoid a lurking constitutional issue. See, e.g., St. Cyr, 533 U.S. at 299-300 ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)) (citation omitted)); Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574-75 (1988) (construing a statute to avoid serious constitutional problems in step one of the Chevron analysis). Since this issue has not been fully developed by the parties and since, in all events, we do not reach the constitutional question, see text supra, we have no occasion to reach this question. Thus, we leave open the possibility that the rule of avoidance might lead to a different statutory construction.

-22-

We decline to address the merits of this argument.  It is beyond peradventure that before a petitioner in an immigration case may advance a procedural due process claim, he must allege some cognizable prejudice fairly attributable to the challenged process.  See, e.g., Ojeda-Terrazas, 290 F.3d at 302; Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999).  That prerequisite is absent here.

The petitioner does not dispute that when he left the United States in 1996, his departure constituted a self-deportation.  Nor does he contest that he reentered the country illegally in 1997.  Thus, the petitioner effectively has admitted all the facts necessary to warrant reinstatement of the original deportation order.  It follows inexorably that he cannot show prejudice attributable to the government's use of a summary process in his case.  Ojeda-Terrazas, 290 F.3d at 302.  Consequently, we are without authority to reach his due process initiative.[6]

---

[6]Although this case does not provide a vehicle for testing the merits of the constitutional claim, we do not mean to imply that the claim is insubstantial.  The summary reinstatement process offers virtually no procedural protections.  The regulation grants aliens to whom it applies nothing more than a chance to make a statement opposing reinstatement to an immigration officer (not to a judge).  It guarantees the alien no notice before reinstatement of a prior deportation order, affords him no real opportunity to contest the facts underlying the reinstatement, and contemplates no presentation of evidence.  See generally 8 C.F.R. § 241.8.  While judicial review of reinstatement orders is available in the courts of appeals, see 8 U.S.C. § 1252, that review may not be adequate when the alien has not been given a meaningful opportunity to develop an administrative record.

## D.  **Section 245(i)**.

Finally, the petitioner suggests that even if section 241(a)(5) is generally enforceable, he remains eligible to seek adjustment of status under INA § 245(i), 8 U.S.C. § 1255(i). Because this suggestion rests on a matter of statutory construction, we undertake de novo review. Strickland v. Comm'r, Me. Dep't of Human Servs., 96 F.3d 542, 545 (1st Cir. 1996).

INA § 245(i) allows certain classes of illegal aliens, including those who are spouses of United States citizens, to petition for adjustment of status. The petitioner posits that the availability of relief under section 245(i), especially in light of Congress's reenactment of that provision in 2000, conflicts with section 241(a)(5)'s bar on relief. He then invites us to resolve this perceived conflict by holding that section 245(i) effectively trumps section 241(a)(5), thus permitting an alien subject to the latter provision to apply for adjustment of status under the former provision.

The short answer to this invitation is that the petitioner has erected a straw man:  there is no meaningful conflict between sections 241(a)(5) and 245(i). Section 241(a)(5) only bars aliens who have illegally reentered the United States after having previously been deported from applying for relief. Many aliens illegally present in the United States (perhaps most such aliens) have never before been deported, and nothing in

-24-

section 241(a)(5) prevents them from seeking adjustments of status under section 245(i).  The mere fact that section 241(a)(5) precludes a subset of aliens from taking advantage of section 245(i) does not create a conflict.  Cf. Hughes v. Att'y Gen., 377 F.3d 1258, 1268 (11th Cir. 2004) (finding no conflict, for preemption purposes, when a federal statute only applied to a subset of activity regulated by the state statute, and the conduct in question fell outside that subset).  We hold, therefore, that section 245(i) creates no impediment to the government's application of section 241(a)(5) in this case.  Accord Alvarez-Portillo, 280 F.3d at 862.

## IV.  CONCLUSION

We need go no further.  IIRIRA has tightened the screws on deportation proceedings in a variety of ways, and persons of good will can disagree as to the policy judgments that those stringencies reflect.  Such judgments are, however, for the Congress, not for the courts.  See, e.g., Plumley v. S. Container, Inc., 303 F.3d 364, 375 (1st Cir. 2002).  Our task is simply to interpret Congress's handiwork and measure the end product against appropriate legal and constitutional benchmarks.  Having performed that task, we are constrained to reject the instant petition.

**The petition for review is denied and dismissed**.

-25-